UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JAMES JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-00435-JRS-DLP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Order Granting Motion for Summary Judgment, Granting Motion to Strike and
Directing Entry of Final Judgment**

Plaintiff James Jones was a federal inmate[1] incarcerated in the Special Housing Unit (SHU)

of the Federal Correctional Institution in Terre Haute, Indiana (FCI – TH).  On August 12, 2016,

Mr. Jones filed this action against the United States alleging that the United States was negligent

in failing to properly maintain the water quality at FCI – TH, which resulted in Mr. Jones

contracting the *Helicobacter pylori* ("*H. pylori*") virus.  This claim was brought pursuant to the

Federal Tort Claims Act.  Mr. Jones also alleged that he lost two toenails as a result of black mold

in his cell.  On October 24, 2017, counsel was recruited to represent the plaintiff.[2]

Presently pending before the Court is the defendant's motion for summary judgment.  Dkt.

125.  The plaintiff filed a response in opposition as to the *H. Pylori* claim but agreed to the

dismissal of his loss of toenails from black mold claim.  *See* dkt. 136 at 3.  The defendant filed a

reply.  Dkt. 143.  Additionally, the defendant filed a motion to strike the expert report and

---

[1] Mr. Jones was released from federal custody on October 16, 2018.

[2] The Court is grateful to Paul Sweeney, Christine Astbury, and Gregory W. Pottorff of Ice Miller
LLP for accepting the Court's request for assistance and their diligent efforts on behalf of Mr.
Jones.

testimony of Dr. Ramon Lopez, Mr. Jones' proposed expert. For the reasons explained below, the motion to strike, dkt. [141], is **GRANTED**.[3] Additionally, the motion for summary judgment, dkt. [125], is **GRANTED**.

## I. Motion to Strike

Presently pending before the Court is defendant's motion to strike the expert report and testimony of Dr. Ramon Lopez, dkt. 135-4, proffered by plaintiff James Jones in support of his opposition to defendant's motion for summary judgment.

As background on Dr. Lopez, Dr. Lopez has been at the IU Fairbanks School of Public Health, Department of Environmental Health Science, for over five years, beginning in 2012 as a postdoctoral fellow, followed by a visiting research faculty position, and currently as an assistant research professor. *Id.* at 56. His training and research experience as a graduate student were on exposure assessment in water, and to non-ionizing radiation. He teaches an exposure assessment laboratory course, that includes collection and measurement of bacterial indicator organisms in drinking water and in bodies of water. He was hired to prepare a report on the likelihood that Mr. Jones contracted *H. pylori* from contaminated water at FCI – TH. He presumed nine statements as true:

> a. Although H. pylori is generally acquired in childhood, rather than during adult life, there exists no direct or circumstantial evidence that Mr. Jones acquired H. pylori in childhood.
>
> b. Mr. Jones has never lived in a developing country.
>
> c. Living in crowded conditions, like a prison/federal penitentiary, puts a person at a greater risk of H. pylori infection.
>
> d. There exists no evidence that prior to July 2014, that Mr. Jones was exposed to water supplies that had been contaminated by human feces.

---

[3] The Court notes that even if it had denied the motion to strike, it would have still granted the motion for summary judgment.

e. There exists no evidence that prior to July 2014, Mr. Jones lived with anyone who has an H. pylori infection.

f. James Jones was not infected with H. pylori at any time prior to his incarceration at FCI Terre Haute;

g. James Jones did not contract H. pylori by way of human-to-human contact with another inmate while incarcerated at FCI Terre Haute;

h. H. pylori can be transmitted to humans through drinking water; and,

i. The drinking water at FCI Terre Haute was contaminated with total coliform.

Dkt. 135-4 at 52. Based on these presumptions, he provided the following expert opinion, in relevant part:

The presence of total coliform in drinking water is considered a measure of the adequacy of water treatment and the integrity of the distribution system. … The presence of e-coli, is considered to be the best indicator of fecal pollution and of the presence of pathogens capable of causing disease or infection. H. pylori is a bacterium not in the same group as total or fecal-coliform, but is found in the feces of infected individuals and animals, and has been found in feacally [sic] polluted waters. It is believed that H. pylori can be transmitted via oral-oral from salivary secretions, or fecal-oral route.

Only two studies have sampled for H. pylori, e-coli, and total coliform from the same body of water to determine how well these indicator organisms correlate with the presence of H. pylori. The studies collected water from private wells and surface ground water sources in Pennsylvania and Ohio. They found that a high percentage of wells (85%) that tested positive for H. pylori bacteria also tested positive for total coliform bacteria, and similarly found many wells positive for H. pylori also were positive for e-coli. In some cases, H. pylori was detected without the presence of e-coli or total coliform.

The positive total coliform result of the single water sample collected at FCI Terre Haute on July 24, 2014 indicates a possible problem with the water supply. It is unclear what the source of the positive result was, but it cannot be ruled out that a contamination of the water supply at FCI Terre Haute may have occurred, and that Mr. Jones was exposed to the contaminated water that could have included the H. pylori bacteria. A lack of follow up testing required under Indiana Rule 327 IAC 8-2-8.1 leaves the quality of the drinking water at FCI Terre Haute between the initial positive test on July 19, 2014 and the required follow up on September 18, 2014 in question. If Mr. Jones did become infected from the water supply at FCI Terre Haute, then the potential of the infection to remain active for long periods of time

is plausible, and likely, as studies have concluded that many individuals become infected at a young age and carry the infection through adulthood. While most studies do indicate that infection occurs more readily during adolescence, it has been demonstrated that infection can and does occur in adulthood.

My review of Mr. Jones's medical records did not indicate that Mr. Jones contracted an H. pylori infection during his adolescence, or was infected with the bacteria prior to his incarceration at FCI Terre Haute. … Living in crowded conditions, such as a prison/correctional facilities may be a risk factor for contracting H. pylori, as studies have demonstrated that the density of living conditions is associated with an increased risk of infection. Other studies have investigated populations that are institutionalized, specifically populations with various mental and physical disabilities and have reported higher rates of infections in populations living in these environments. My review of the documents did not suggest a separate event that could have resulted in Mr. Jones being contaminated with H. pylori, or Mr. Jones living with someone who carried the infection prior to July of 2014. It is plausible that Mr. Jones could have contracted the infection via a different route of exposure, such as human-to-human contact with another inmate while incarcerated at FCI Terre Haute. However, the documents and information provided to me do not lend support for any type of human-to-human causation of Mr. Jones' H. pylori infection.

I conclude from my review of the records that a single water sample tested positive for total coliform during the time Mr. Jones was incarcerated at the facility, and that total coliform is an indicator for possible issue with the water distribution system, or water source that can include contamination from pathogenic organisms such as H. pylori. In Mr. Jones' medical records and his deposition, there are indications that he suffered from dyspepsia beginning in 2010, and Mr. Jones claims the symptoms have worsened after drinking water at FCI Terre Haute during the time of the positive total coliform test. Dyspepsia is a common symptom reported by individuals with an H. pylori infection. …

Based upon my education and experience as a Certified Industrial Hygienist, my previous water-based research and work, my review of records submitted to me, and taking as true the presumptions listed above, I can opine to a reasonable degree of scientific certainty that it is more likely than not that Mr. Jones contracted H. pylori from the drinking/bathing water at FCI Terre Haute. Furthermore, and also based upon my education, experience, research, review of the records and information submitted to me, and taking as true the presumptions listed above, it cannot be stated to a reasonable degree of scientific certainty that Mr. Jones was NOT exposed to some kind of bacteria that causes H. pylori during his incarceration at FCI Terre Haute.

Dkt. 135-4 at 53-54.

**A.      Standard for Admissibility of Expert Witness Testimony**

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The rule requires "evidentiary relevance and reliability" of expert testimony, with the focus on "principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).  "The district court acts as a 'gatekeeper' in determining the relevance and reliability of the opinion testimony, and enjoys 'broad latitude' in making such a determination."  *United States v. Moshiri*, 858 F.3d 1077, 1083 (7th Cir. 2017) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

"[T]he district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).   "[T]he key to the gate is not the ultimate correctness of the expert's conclusions.  Instead, it is the soundness and care with which the expert arrived at her opinion[.]"  *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (internal citations and quotations omitted).

Under the first step of the analysis, a witness is qualified based on their "knowledge, skill, experience, training or education."  Fed. R. Evid. 702.

Under the second step of the analysis, "the court must determine whether the expert's testimony reflects scientific knowledge; that is, the court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citing *Daubert*, 509 U.S. at 592-93). "*Daubert* provides several guideposts for determining reliability. These guideposts examine (1) whether the scientific theory has been or can be tested; (2) whether the theory has been subjected to peer-review and/or academic publication; (3) whether the theory has a known rate of error; and (4) whether the theory is generally accepted in the relevant scientific community." *C.W.*, 807 F.3d at 835. "In some cases it may also be appropriate to examine … whether there is too great an analytical gap between the data and the opinion proffered." *Id.* (internal citations and quotations omitted). "Ultimately, there are many different kinds of experts, and many different kinds of expertise. The test of reliability, therefore, is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Gopalratnam*, 877 F.3d at 780.

Under the third part of the *Daubert* analysis, the court determines whether the proposed expert testimony will assist the "trier of fact in understanding the evidence or in determining a fact in issue." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).

In toxic tort cases, there is a two-step process in examining the admissibility of causation evidence. First, the court must determine whether there is general causation, and if there is, then the court must determine whether there is admissible specific causation evidence. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 831 (7th Cir. 2015) (citing *7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 389 (Ind. Ct. App. 2006) (requiring toxic tort plaintiffs to "establish both generic and individual causation" and finding plaintiffs who did not first prove general causation would not be entitled to recover)). General causation examines whether the substance "had the capacity to cause

the harm alleged[.]"  *7-Eleven*, 857 N.E.2d at 389.  Specific causation, by contrast, examines whether the substance did, in fact, cause the harm alleged.  *Id*.

**B.     Discussion**

The defendant has asked the Court to strike Dr. Lopez's expert report and testimony pursuant to Federal Rule of Evidence 702 and the *Daubert* standard.  The defendant asserts that Dr. Lopez is not qualified to render a medical causation opinion on *H. pylori* and the likelihood of contracting *H. pylori* from contaminated water.  Dkt. 142 at 4-7.  The defendant further asserts that Dr. Lopez's opinions are not reliable.  *Id.* at 7-13.  Finally, the defendant argues that Dr. Lopez's opinions and conclusions are inadmissible and not helpful to the Court.  *Id.* at 13-14.

In response, Mr. Jones argues that Dr. Lopez is qualified and that his opinions are reliable and helpful.  Dkt. 149 at 1.  Mr. Jones further asserts that the defendant's objections go to the weight of the evidence and not its admissibility.  Mr. Jones first notes that the defendant only challenges Dr. Lopez's medical causation opinions and asserts that Dr. Lopez's other opinions should be considered and not stricken.  Further, Mr. Jones argues there is no dispute that *H. pylori* can be transmitted through waterborne exposure.  Mr. Jones acknowledges that "there is little direct and positive evidence available to [Dr. Lopez] linking Mr. Jones' infection to the contaminated water at FCI," dkt. 149 at 10, but asserts the defendant is to blame for "spoliation of evidence and failure to properly conduct retesting following the July 24, 2014 positive water sample."  *Id.* at 10-11.

In reply, the defendant notes that it is "unclear what purpose Dr. Lopez's testimony would serve in this case" given that Dr. Lopez has acknowledged that "there is no consensus among the scientific community about exactly how *H. pylori* is transmitted to humans" and that "he is not

giving an opinion that Mr. Jones was actually exposed to harmful levels of a specific contaminant or that such exposure caused Jones to contract *H. pylori*." Dkt. 150 at 1.

          1.      <u>Dr. Lopez's Qualifications</u>

FRE 703 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion." The Court agrees with the defendant that Dr. Lopez is not qualified to provide a medical causation opinion, at least because Dr. Lopez is not a medical doctor, dkt. 142-1 at 11, and further because he has no specialized knowledge or experience with *H. pylori* or gastrointestinal systems or symptoms, *id*. Dr. Lopez only began reading articles about *H. pylori* in response to being hired as an expert in this lawsuit and had never before researched or studied *H. pylori*. Dkt. 142-1 at 11, 14 ("I knew [*H. pylori*] existed as an agent, but I never researched it other than for this case"). Mr. Jones appears to concede that Dr. Lopez is not qualified to provide a medical causation opinion in his response to the motion to strike. *See* Dkt. 149 at 2.

Moreover, Dr. Lopez exhibits a lack of expertise, knowledge, and/or support underlying his medical opinions. In his expert report, Dr. Lopez references Mr. Jones' medical condition, such as "[d]yspepsia is a common symptom reported by individuals with an *H. pylori* infection," but does not provide support for his opinions. When asked in his deposition how soon gastrointestinal symptoms would present themselves in people who ingested contaminated water, Dr. Lopez acknowledged "that's more of a medical question, and I don't have the experience to respond to that." Dkt. 142-1 at 26. Similarly, Dr. Lopez stated in his report that living in crowded conditions like a prison puts a person at greater risk for an *H. pylori* infection, dkt. 135-4 at 54, but he could not recall what research supported this proposition in his deposition, dkt. 142-1 at 16.

And when asked why living in prison-type conditions would lead to higher rates of *H. pylori*, Dr. Lopez responded, "I do not know." *Id.*

It is also not clear to the Court that Dr. Lopez is qualified even to provide an opinion regarding the presence of *H. pylori* in water and the transmission of *H. pylori* through waterborne sources. Dr. Lopez's background is in laser and air particulates. Mr. Jones identifies three of Dr. Lopez's papers as dealing "specifically with topics relevant to this lawsuit" to argue that Dr. Lopez is qualified as an expert on the topics in this case:

- Lotter J., Lacy S., Lopez R., Lippert, J., Franke, J. (2012). Contributing factors to fires during medical laser applications. Journal of Laser Applications 24. Published online 10 pages.

- Lippert, F., Lacey, S., Lopez, R., Frank, J., Conroy, L., Breskey, J., Esmen, N., Liu, L. (2013). A pilot study to determine medical laser generated air contaminant emission rates for a simulated surgical procedure. Journal of Occupational and Environmental Hygiene 11(6) P. D69-D76.

- Lopez, R., Wong, V., Farber, M., Lacey, S. (2016). Biomarkers of human cardiopulmonary response after short term exposure to medical laser generated particulate matter from simulated procedures; a pilot study. Journal of Occupational and Environmental Medicine. 58(9): 940-5.

Dkt. 149 at 5-6. The Court does not agree that these three papers related to the application of medical laser or exposure to medical laser generated particulates are related to the transmission of *H. pylori* through water. Dr. Lopez's background is on the assessment of exposure through airborne, not waterborne, sources. Mr. Jones' argument, that "[w]hether it involves H. pylori or other substances, 'the process is . . . the same' – it involves 'collecting the agent, measuring it, making conclusions about what it means in terms of health for individuals, [and] comparing it to a reference dose or a dose that we consider to be safe or the threshold level of where safe and unsafe . . . starts,'" dkt. 149 at 6, only highlights Dr. Lopez's lack of qualification in this case. Here, the case relates to the ability to contract *H. pylori* through drinking contaminated water, and

not with the ability to properly sample water and assess whether there are safe levels of *H. pylori* and other bacteria in that water.

Mr. Jones argues that "Dr. Lopez is qualified to render opinions on (i) the Government's failure to follow water testing protocols, (ii) the presence of disease causing organisms, such as H. pylori, in water, (iii) the transmission of H. pylori from exposure to water contaminated with the bacteria, and (iv) the likelihood that Mr. Jones contracted H. pylori from drinking and bathing in the water at FCI Terre Haute." Dkt. 149 at 1. As explained in more detail below, the defendant's failure to follow water testing protocols is not at issue in this case. Moreover, as previously discussed, Dr. Lopez is not qualified to discuss *H. pylori* where he has no specialized knowledge or experience with *H. pylori,* he only began reading articles about *H. pylori* in response to being hired as an expert in this lawsuit, and he had never before researched or studied *H. pylori*.

Accordingly, the Court finds that Dr. Lopez is not qualified to provide an expert opinion regarding the presence of *H. pylori* in water and/or the transmission of *H. pylori* through waterborne sources.

### 2. Reliability of Dr. Lopez's Report

The defendant argues that Dr. Lopez's expert report and testimony is unreliable because they are not based on any articulated standard or methodology. The defendant further argues that "[h]is expert report is perfunctory and offers no explanation of the science Dr. Lopez purports to apply in arriving at his causation conclusion. He does not discuss the scientific data or widely-accepted principles regarding the causes of *H. pylori* or whether it may be contracted through waterborne or other means." Dkt. 142 at 8.

The Court agrees that Dr. Lopez's report lacks certain indicia of reliability. Dr. Lopez's report admits that there is a lack of evidence to show: (1) what was the source of the positive result

on July 24, 2014; (2) that there was contaminated water at FCI – TH; (3) that Mr. Jones was previously infected with *H. pylori*; and (4) that there was a separate method by which Mr. Jones could have contracted *H. pylori*. Despite this lack of evidence, Dr. Lopez definitively concludes, without support, that he can "opine to a reasonable degree of scientific certainty that it is more likely than not that Mr. Jones contracted H. pylori from the drinking/bathing water at FCI Terre Haute." Dkt. 135-4 at 54.

However, immediately after, Dr. Lopez implies that the defendants cannot conclude with "a reasonable degree of scientific certainty that Mr. Jones was NOT exposed to some kind of bacteria that causes H. pylori during his incarceration at FCI Terre Haute." *Id.* (emphasis added). Dr. Lopez explains that, "such a definitive expert opinion cannot be made because there exists no evidence of Mr. Jones being contaminated as a child, and the other risk factors for in fact, or pre-incarceration at FCI Terre Haute, do not exist, or have not been brought to my attention." *Id.* at 54-55. This explanation appears equally applicable to undermine his first "expert" opinion.

"[T]he district court acts as a 'gatekeeper' in determining the relevance and reliability of the opinion testimony, and enjoys 'broad latitude' in making such a determination." *United States v. Moshiri*, 858 F.3d 1077, 1083 (7th Cir. 2017) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). Exercising its discretion, the Court finds Dr. Lopez's report to be unreliable and therefore unhelpful to the issues in this case.

### C.    Conclusion

Because the Court finds Dr. Lopez is not qualified to provide an expert opinion regarding medical issues related to *H. pylori*, the presence of *H. pylori* in water, and/or the transmission of *H. pylori* through waterborne sources, the defendant's motion to strike Dr. Lopez's expert report and testimony, dkt. [141], is **GRANTED**.

## II.     Motion for Summary Judgment

### A.     Summary Judgment Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Not every factual dispute between

the parties will prevent summary judgment, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

As the "'put up or shut up' moment in a lawsuit," summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial. *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017) (citing *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003))). Such a dispute exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of proof. *Id.* (citing *Packer v. Tr. of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 847 (7th Cir. 2015)). The non-moving party bears the burden of specifically identifying the relevant evidence of record, and "courts are not required to scour the record looking for factual disputes." *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015).

### B.     Factual Background

The following statement of facts was evaluated pursuant to the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Jones as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

### 1.     Litigation Background

Since 1996, Mr. Jones has spent a significant portion of his adult life incarcerated at various state and federal penitentiaries. Dkt. 135-7 at 3. Mr. Jones was an inmate in FCI – TH starting

May 29, 2014, until 2016. Dkt. 125-1 at 6; dkt. 135-7 at 4. He claims that in 2014, the drinking water in FCI – TH was "contaminated" with total coliform, which he believes is a strand of E. coli. *Id.* Mr. Jones says that a "host of inmates" told him that the water was found to have contaminants in it. *Id.* at 7. Mr. Jones also claims that a document produced to him from the Indiana Department of Environmental Management (IDEM) dated July 24, 2014, shows that a positive total coliform distribution sample was collected from a sink in the K-unit of FCI – TH. *Id.*; dkt. 125-4; dkt. 125-5.

In September 2015, Mr. Jones tested positive for the presence of *H. pylori* in his gastrointestinal system. Dkt. 125-1 at 10; dkt. 135-16. Mr. Jones believes that he contracted *H. pylori* due to exposure to contaminated water in FCI – TH in July and August 2014. Dkt. 125-1 at 9. No physician, however, has ever informed Mr. Jones that his *H. pylori* was caused by exposure to contaminated water. Dkt. 125-1 at 10. Mr. Jones has had acid reflux since before July 2014 and alleges that the *H. pylori* worsened his acid reflux symptoms. *Id.* at 10-11.

Mr. Jones was treated with medication and was later tested again for *H. pylori*. *Id.* at 10. The results of the follow-up testing were negative for *H. pylori*. *Id.* Mr. Jones has not tested positive for *H. pylori* since September 2015. *Id.*

In February 2016, Mr. Jones submitted a Notice of Tort Claim to the Bureau of Prisons. Dkt. 125-2. In the Tort Claim, Mr. Jones alleged that "I contracted hpylori due to roaches and mice feces being in food here at Terre Haute FCI." *Id.* The BOP denied the tort claim. Mr. Jones then filed this action.

### 2.  Water Samples Tested in FCI – TH in 2014

The federal Safe Drinking Water Act (SDWA) requires that all public water systems (community and non-community) provide an adequate supply of safe drinking water to their

consumers. Dkt. 125-3, ¶ 3. The SDWA and IDEM mandate certain monitoring and reporting of various bacteriological and chemical contaminants, including total coliform and E. coli, that may be found in drinking water. *Id.* Total coliforms are a group of bacteria that are generally harmless, but which may indicate the presence of other pathogens or that the water systems may be vulnerable to other pathogens. *Id.* ¶ 5. Therefore, if total coliforms are found in a routine water sample, it generally requires that a repeat sample or samples be taken. *Id.* Total coliforms are not the same as fecal coliform, E. coli, or *H. pylori*, which may indicate the presence of fecal waste. *Id.*

FCI – TH's public water system experienced persistent plumbing issues throughout 2013, 2014, and 2015, and water was shut off on multiple occasions to perform plumbing repairs. Dkt. 135-20 at 5-16, 22-30, 32-52. Plumbing repairs to water systems pose a significant contamination risk to water distribution systems "if proper procedures and existing standards are not followed," according to the US Environmental Protection Agency. *Id.* at 17-20, 53. Specifically, repairs to water systems can expose the system to contamination, including total coliform contamination, at all times before, during, and after the repairs are made unless proper steps are taken to ensure the system is disinfected. *Id.* at 57-59. Mr. Parr, the General Foreman at the Federal Correctional Complex – Terre Haute ("FCC – TH") testified that it was normal practice at FCC – TH to treat the water and flush out water lines before bringing the water back into use.[4] Dkt. 135-20 at 6, 14. The Safety Department was in charge of testing the water after a shutdown. Dkt. 135-20 at 6.

_____

[4] Mr. Jones asserts that Mr. Parr "stated that the Safety department was responsible for disinfecting the water system after repairs," but Mr. Jones apparently misunderstood Mr. Parr's testimony. "A: We treat the water at the plant. Q: Do you test at all after a shutdown? A: That would be Safety." Dkt. 135-20 at 6.

On July 24, 2014, a water sample taken from a sink in the K Unit of FCI – TH tested negative for E. coli, but positive for the presence of total coliform. Dkt. 125-4. On July 28, 2018, the BOP was notified of the positive result. Dkt. 125-7 at 18, 25-26. Based on the positive sample result, the FCI – TH collected six follow-up samples on July 28, 2014 – the same day it received notification - all of which tested negative for the presence of total coliform. Dkt. 125-7 at 20-21, 26; dkt. 125-8. One of the six follow-up samples was taken again from the K Unit sink (the site of the previous positive sample from four days earlier). Dkt. 125-8 at 3. This time, the sample was negative for the presence of total coliform and E. coli. *Id.*

The BOP then took additional water samples from the FCI – TH in August 2014. These samples did not show the presence of either E. coli or total coliform. Dkt. 125-9. The BOP received a Monitoring and Reporting Violation from the IDEM informing the BOP that it should have taken five fixture follow-up samples in August; not two. Dkt. 125-5. Accordingly, on September 18 and 19, 2014, the BOP collected five additional water samples from the FCI – TH. Dkt. 125-7 at 27.[5] The five samples collected did not show the presence of either E. coli or total coliform. *Id.*

In October and November 2014, the BOP took routine water samples from FCI – TH, which did not test positive for E. coli or the presence of total coliform. Dkt. 125-6.

The FCI – TH drinking water system supplies water to both staff and inmates and is the same water supply line that provides water to staff housing. At no time in 2014 or 2015 was FCI – TH notified that it had exceeded the maximum level for total coliform in its drinking water

---

[5] The Court notes that the United States allegedly attached results of the September 2014 testing, but the attached exhibits are for the October and November 2014 testing. *See* dkt. 125-10. Additionally, the United States allegedly attached deposition pages 56-57 and 61 to Lamping's deposition (*see* dkt. 126 at 5), but those pages were not submitted in support of the motion for summary judgment (*see* dkt. 125-3) and therefore could not be considered as evidence.

supply.  Dkt. 125-3 at ¶ 7.  At no point in 2014 or 2015 was FCI – TH notified by IDEM that its drinking water violated safe drinking water standards.  Dkt. 125-7 at 16, 27.  At no time in 2014 or 2015 was FCI – TH placed on a "boil water" notice or otherwise notified that its drinking water was unsafe to consume.  Dkt. 125-7 at 28.

### 3.   Mr. John Mundell's Expert Opinion Regarding Water Sample

The defendant submitted an expert opinion from Mr. John Mundell, an environmental consultant, regarding the water sample results from FCI – TH during the relevant time period.  Dkt. 125-11.  Mr. Mundell has a Bachelor of Science degree in Civil Engineering and a Master's degree in Civil Engineering, specializing in geotechnical engineering.  He is a Professional Engineer and Licensed Professional Geologist with over 39 years of experience in water resources, wellhead protection, groundwater contamination, well systems, drinking water protection and regulatory compliance.  Dkt. 125-12.  He has also been involved in research of environmental/geotechnical issues related to groundwater contamination and waste containment.  In addition, Mr. Mundell has been responsible for the development and implementation of environmental standard operating procedures and quality assurance/quality control programs, regulatory status evaluation, technical specialty group management, and in-house training and research for one of the largest environmental consulting firms in the United States.

Having reviewed the drinking water sample test results from FCI – TH, Mr. Mundell concluded that the BOP did not violate the SDWA during the relevant time period.  Dkt. 125-11 at 12-14.  Mr. Mundell explained that although the presence of total coliform was detected in one sample; all of the follow-up samples tested negative for total coliform and E. coli.  Moreover, Mr. Mundell determined that the detection of total coliform at one fixture in July 2014 is not indicative of systemic water contamination within the drinking water supply at FCI – TH.  *Id.* at 14.  As Mr.

Mundell explained, coliform bacteria are common in the environment. *Id.* Because total coliform was only detected on one sink fixture, which later tested negative for total coliform, it is possible that the faucet itself was not properly sanitized or that there was cross-contamination during the sample collection. *Id.* at 14-15. Mr. Mundell noted that FCI – TH has experienced other ephemeral total coliform detections including in July 1995, May 2007, and February 2017. *Id.* at 15. At any rate, based on the absence of total coliform or E. coli in follow-up testing, Mr. Mundell opined that the drinking water at FCI – TH was not compromised during the time period at issue. *Id.* Finally, Mr. Mundell opined that it is unlikely that the *H. pylori* infection experienced by Mr. Jones was directly attributable to a single ephemeral total coliform detection at a fixture or to unsafe drinking water quality at the Site. *Id.* at 15-16.

4.    Mr. Jones' Interactions with FCI – TH water and Medical Treatment

Mr. Jones testifies that prior to his incarceration at FCI – TH, he had never contracted *H. pylori*; had never lived in a developing country or with anyone who was infected with *H. pylori* infection; and had never been exposed to water supplies that had been contaminated by *H. pylori* or human feces. Dkt. 135-5 at 2. Additionally, Mr. Jones is not aware of any relatives or friends with whom he would have been in contact with that had been infected with *H. pylori*, and he states he did not have sexual contact with anyone during his incarceration at FCI – TH. *Id.* at 2-3.

Shortly after his transfer to FCI – TH, Mr. Jones feared that FCI – TH's water was contaminated due to the color and odor of the water. Dkt. 135-7 at 5; dkt. 135-5 at 4. Mr. Jones experienced significant digestive issues, including acid reflux and extreme discomfort, which he attributed to the water he believed to be contaminated. *See* dkt. 135-7 at 6, 8; dkt. 1 at 29. Mr.

Jones requested that he be allowed to purchase bottled water.[6]  Dkt. 135-7 at 6, 8.  His requests were denied.  Dkt. 1 at 13; dkt. 135-15 at 38-39, 112-115.  FCI – TH denied his request because "[w]hile in the SHU, inmates are not permitted to purchase or maintain bottled water inside their cells… These items pose a threat to the secure and orderly running of the unit for various reasons." Dkt. 135-15 at 114.  Mr. Jones later learned from other inmates visiting the Special Housing Unit (SHU) that FCI – TH's public water system tested positive for total coliform on July 24, 2014, and that it recorded a monitoring violation for August 2014.  Dkt. 135-7 at 5.  He testified that he immediately requested to be tested for *H. pylori* after he first learned about *H. pylori* from other inmates at FCI – TH.  Dkt. 135-5 at 4.

Mr. Jones tested positive for *H. pylori* on September 14, 2015.  Dkt. 125-15 at 2.  The diagnosis was made on the basis of a positive blood test showing the presence of Immunoglobulin G – abbreviated IgG – antibodies to *H. pylori* infection in his bloodstream.  Dkt. 125-17 at 3.  A detection of IgG does not indicate an acute infection of *H. pylori*, but rather that the antibodies exist in the bloodstream and the individual was at some point in time exposed to *H. pylori*.  *Id.* at 3-4.  Nevertheless, Mr. Jones was treated with antibiotics for 14 days and then retested for *H. pylori*.  Dkt. 125-15 at 2.  On November 4, 2015, Mr. Jones tested negative for *H. pylori*.  *Id.*  Mr. Jones was tested again for *H. pylori* on December 15, 2016, and again tested negative.  *Id.*  Dr. William Wilson was the Clinical Director for the FCC – TH from 2014 through the present.  *Id.* He does not recall any sort of outbreak of *H. pylori* or gastrointestinal illness among inmates or staff in 2014 or 2015.  *Id.*

---

[6] While the Court agrees that Mr. Jones repeatedly asked for bottled water, the Court does not find any support that Mr. Jones repeatedly asked to be tested for *H. pylori* prior to September 2015.

The records produced by the defendant indicate that a prisoner other than Mr. Jones at FCI – TH tested positive for *H. pylori* on September 10, 2015. Dkt. 135-8 at 38. Mr. Jones tested positive for *H. pylori* six days later, on September 16, 2015. Mr. Jones was not listed on the list produced by the defendant of *H. pylori* testing results for FCC – TH inmates. *See id.*

Mr. Jones filed administrative complaints related to his *H. pylori* medical treatment after he had already tested positive in September 2015. *See* dkt. 1 at 26-32.

### 5.    Dr. Howden's Medical Expert Opinion Regarding *H. pylori*

The defendant submitted an expert opinion from Dr. Colin W. Howden, a professor of gastroenterology and hepatology, Chief of Gastroenterology at the University of Tennessee Health Science Center in Memphis, TN, and chief of gastrointestinal service at Regional One Health in Memphis, TN. Dkt. 125-13. Dr. Howden frequently sees patients with *H. pylori* infection in his practice and is considered an expert in the diagnosis and management of *H. pylori*, having published on the topic and given frequent lectures and talks on the subject. *Id.* at 3. Additionally, he co-authored the 2017 practice guidelines of the American College of Gastroenterology (ACG) concerning the management of *H. pylori*.

Dr. Howden explained that *H. pylori* is generally acquired in childhood rather than in adulthood. Dkt. 125-13 at 1. Particularly, in developing countries, exposure to water supplies that had been contaminated by human feces may play a role in the transmission of the infection. *Id.* at 2. However, around the world, the main risk factors for the acquisition of the infection are low socioeconomic status and having close relatives (particularly a mother) with *H. pylori* infection. In the United States, Dr. Howden is unaware of any evidence of *H. pylori* being transmitted to children via contaminated water, which is even less likely among adults. *Id.*

Dr. Howden concluded that it is most likely that Mr. Jones was already infected with *H. pylori* at the time of his incarceration. *Id.* at 1. Dr. Howden notes that Mr. Jones already had a variety of symptoms related to his gastrointestinal tract including heartburn, dyspepsia, and chronic constipation, but that except for dyspepsia, these symptoms are unrelated to *H. pylori.*

Dr. Howden also explained that *H. pylori* is typically asymptomatic. Many individuals have *H. pylori* which is essentially "silent" and not discovered unless they are tested for the infection for some reason. *Id.*

Dr. Howden opined that Mr. Jones' triple drug regimen treatment after testing positive for *H. pylori* was appropriate and within the applicable standard of care and given for the recommended duration of treatment. *Id.* at 3. Dr. Howden also opined that Mr. Jones was appropriately retested after completing the treatment, and that the treatment was successful in that Mr. Jones has not tested positive for *H. pylori* since September 2015. *Id.*

Seven months after the preparation of his initial expert report, Dr. Howden also prepared a one-page document providing other opinions. Dr. Howden opines that he continues "to believe that plaintiff most probably acquired *H. pylori* infection in early childhood. …. If he was exposed to water that tested positive for "Total Coliform", then he would not be the only person to have that exposure." Dkt. 125-13 at 10. Dr. Howden also opines that "[g]iven that his symptoms persisted after documented cure of the *H. pylori* infection, I conclude that his symptoms [such as dyspepsia] were unrelated to his *H. pylori* infection and were more likely to be due to his NSAID use." *Id.*

6.    Plaintiff's Statement of Material Facts in Dispute

Mr. Jones argues that there are a number of material facts in dispute ("MFD") that preclude summary judgment. As discussed in more detail below, each of the plaintiff's "material facts in

dispute" are irrelevant to the allegation set forth in the complaint or are meritless. Each is discussed below.

### a. MFD 1 – Compliance

"1. Mr. Jones disputes the Government's implication that it substantially complied with the Indiana Department of Environmental Management's ("IDEM") regulations after its public water system ("PWS") tested positive for total coliform on July 24, 2014." Dkt. 136 at 3. Although there is a dispute as to whether FCI – TH substantially complied with IDEM's regulations, this dispute is not relevant to this case. The case relates to whether the water at FCI – TH was contaminated with *H. pylori* and whether Mr. Jones contracted *H. pylori* from contaminated water at FCI – TH. This case is not about whether FCI – TH properly tested its water or collected enough samples per regulation, or whether it properly managed its water supply to ensure clean water supply.

### b. MFD 2 – Total Coliform

"2. Mr. Jones further disputes the Government's implication that the absence of E. coli in the positive total coliform sample is significant where total coliform was present, as well as its assertions that "[t]otal coliforms are a group of bacteria that are generally harmless," and that "[t]otal coliforms are not the same as fecal coliform or E. coli, which may indicate the presence of fecal waste." Dkt. 136 at 5. Mr. Jones argues that Mr. Lamping[7]'s assertions are unreliable and proffers in opposition only the testimony of Dr. Lopez[8], but contrary to Mr. Jones' assertion, Dr.

---

[7] Mr. Lamping is the Environment and Safety Compliance Administrator at FCC – TH. Mr. Lamping provided a declaration in support of the defendant's motion for summary judgment discussion water safety regulations and the samples collected at FCI – TH in 2014. *See* dkt. 125-3.

[8] The Court previously granted the defendant's motion to strike Dr. Lopez's expert report and testimony.

Lopez's testimony even though stricken is consistent with the Government's statements on this point.

Moreover, the Court finds the Government's statements regarding total coliform to be reliable and supported by reputable sources. For example, the United States Environmental Protection Agency states that "[g]enerally coliforms are bacteria that are not harmful and are naturally present in the environment. They are used as an indicator that other, potentially harmful, fecal bacteria (indicated by the *E. coli* species) could be present." *See* "Addressing Total Coliform Positive or E.coli Positive Sample Results in EPA Region 8," https://www.epa.gov/region8-waterops/addressing-total-coliform-positive-or-ecoli-positive-sample-results-epa-region-8 (last accessed January 22, 2019); *see also* "Coliform Bacteria in Drinking Water Supplies," ("NY Coliform") https://www.health.ny.gov/ environmental/water/drinking/coliform_bacteria.htm (last accessed January 22, 2019). The Department of Health of New York State defines "fecal coliforms" as "the group of the total coliforms that are considered to be present specifically in the gut and feces of warm-blooded animals." *See* NY Coliform.

### c.     MFD 3 – Maximum Contaminant Levels

"3. Mr. Jones disputes that EPA and IDEM establish a threshold concentration level as the maximum contaminant level ('MCL') for total coliform that is 'compared' to positive samples to determine if the 'water is safe for human consumption.'" Dkt. 136 at 5-6. As explained above in MFD 1, this dispute is not relevant to this case. The case relates to whether the water at FCI – TH was contaminated with *H. pylori* and whether Mr. Jones contracted *H. pylori* from contaminated water at FCI – TH. This case is not about whether FCI – TH properly tested its water or collected enough samples per regulation.

### d. MFD 4 – MCL levels

"4. Relatedly, Mr. Jones disputes the Government's implication that FCI's PWS did not exceed the MCL for total coliform simply because FCI was not 'notified that it had exceeded the MCLs for total coliform in its drinking water supply' in 2014 or 2015.'" Dkt. 136 at 6. Mr. Jones asserts that that because FCI – TH failed to conduct the required number of follow-up testings after the positive total coliform test, it cannot be known whether they actually exceeded the MCLs for total coliform in FCI – TH's drinking water supply. Although Mr. Jones correctly points out that there is a dispute as to whether or not FCI – TH's drinking water had total coliforms, the Court finds no dispute with the fact set forth by the defendant that FCI – TH was not "notified that it had exceeded the MCLs for total coliform in its drinking water supply" in 2014 or 2015. Mr. Jones has failed to set forth evidence in opposition to show that FCI – TH was in fact notified that it had exceeded maximum coliform levels.

### e. MFD 5 – Systemic Water Contamination

"5. Mr. Jones likewise disputes the Government's assertion that the 'detection of total coliform at one fixture in July 2014 is not indicative of systemic water contamination within the drinking water supply at FCI' in this case where FCI failed to conduct the required follow-up testing." Dkt. 136 at 7. Mr. Jones asserts that "follow-up testing is required by IDEM to ensure that there is not systematic water contamination. 327 IAC 8-2.3-4(a)(2); 327 IAC 8-2-8.1(e)," but that "the testing was not conducted as required by law." The alleged disputed "fact" is the expert opinion of Mr. John Mundell, which opinion Mr. Mundell defended with his reasoning in his expert report. Mr. Jones has not designated any expert report or facts in opposition to Mr. Mundell's report. Mr. Jones' use of speculation and supposition is insufficient to contravene Mr. Mundell's expert opinion.

Moreover, Mr. Jones focuses on FCI – TH's failure to collect sufficient samples in August 2014. The "positive" sample was collected on July 24, 2014. FCI – TH was notified of the total coliform-positive sample on July 28, 2018. Dkt. 125-7 at 18, 25-26. Based on the positive sample result, the FCI – TH collected six follow-up samples, including at the site of the previous positive sample, on July 28, 2014 – the same day it received notification - all of which tested negative for the presence of total coliform. Dkt. 125-7 at 20-21, 26; dkt. 125-8. Again, this case is not about whether FCI – TH properly tested its water or collected enough samples per regulation.

### f. MFD 6 – Compliant with IDEM's Public Notice Requirement

"6. Mr. Jones disputes that FCI complied with IDEM's Public Notice requirement after recording a monitoring violation for failing to comply with IDEM's follow-up testing requirements in August 2014." Dkt. 136 at 7. As explained above, this dispute is not relevant to this case. The case relates to whether the water at FCI – TH was contaminated with *H. pylori* and whether Mr. Jones contracted *H. pylori* from contaminated water at FCI – TH. This case is not about whether FCI – TH properly notified each inmate about possible contamination per regulation. Moreover, the "fact" Mr. Jones is attempting to dispute was not considered by the Court because the evidence in support of the "fact" was not included in the defendant's submission and therefore could not be considered. Thus, this "dispute" is both moot and immaterial.

### g. MFD 7 – Compliance with Federal Safe Drinking Water Act

"7. Mr. Jones further disputes the Government's contention that FCI 'was in compliance with the Federal Safe Drinking Water Act.'" Dkt. 136 at 9. As explained above in MFD 1, this dispute is not relevant to this case. The case relates to whether the water at FCI – TH was contaminated with *H. pylori* and whether Mr. Jones contracted *H. pylori* from contaminated water

at FCI – TH. This case is not about whether FCI – TH properly tested its water or collected enough samples per regulation.

### h. MFD 8 – Transmission of *H. pylori* through water

"8. Mr. Jones disputes that H. pylori cannot be transmitted via water." Dkt. 136 at 9. The defendant did not argue that *H. pylori* cannot be transmitted via water. Rather, their expert, Dr. Howden, merely noted that he "is unaware of any evidence of H. pylori infection being transmitted to children via contaminated water, which is even less likely among adults." Dkt. 126 at 8. Dr. Howden acknowledged in his report that "exposure to water supplies that had been contaminated by human feces may play a role in the transmission of the infection." Dkt. 125-13 at 2. Dr. Lopez even acknowledged that although "[t]he route H. pylori takes into the body has not been thoroughly examined in the literature, [] an epidemiological association has been demonstrated between the presences of H. pylori in drinking water and the prevalence of H. pylori infections in populations." Dkt. 135-4 at 55. Based on the evidence presented to the Court, it appears that it is suspected that *H. pylori* can be transmitted through contaminated water, but that it has not been definitively shown.

### i. MFD 9 – IgM antibodies

"9. Mr. Jones also disputes that the presence of Immunoglobulin G ('IgG') antibodies (as opposed to Immunoglobulin M ('IgM') antibodies) indicates that his infection could not have occurred while he was in the custody and care of FCI." Dkt. 135 at 9. Mr. Jones references the defendant's assertion that "A detection of IgG does not indicate an acute infection of H. pylori, but rather that the antibodies exist in the bloodstream and the individual was at some point in time exposed to H. pylori." *Id.* (citing dkt. 126 at 7). The Court does not construe the defendant's assertion to mean that the presence of IgG antibodies meant that Mr. Jones contracted *H. pylori*

prior to his incarceration at FCI – TH. Accordingly, the Court does not find that there is any dispute at all in this respect.

### j. MFD 10 – *H. pylori* could not have existed post-2010

"10. Mr. Jones disputes the Government's implication that he did not contract H. pylori from the contaminated water at FCI because 'most cases of H. pylori' are contracted in childhood[.] … In actuality, it is highly unlikely that an H. pylori infection could have survived in Mr. Jones since childhood due to his intervening antibiotic treatment." Mr. Jones argues that he suffered a gunshot wound in September 2010 and, as part of the treatment, he took a number of antibiotics that would have necessarily killed any *H. pylori* to the extent he already had it. Although Mr. Jones has submitted evidence of his hospitalization and taking of antibiotics, there is no admissible evidence to support that Mr. Jones' taking of antibiotics would have necessarily killed any *H. pylori*. *See* Local Rule 56-1(e) ("A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence.). Mr. Jones' conclusion may sound rationale, but Mr. Jones has not included any expert report or declaration from a medical doctor in support nor has he included any documentation that antibiotics taken in connection with a gunshot wound would eradicate *H. pylori*. Accordingly, the Court will not consider as fact Mr. Jones' assertion that *H. pylori* could not have survived his medical treatment in September 2010.[9]

---

[9] Rather, a medical paper explained that "[t]he survival capabilities of H pylori in the stomach make it difficult to eradicate, and effective treatment requires multidrug regimens consisting of two antibiotics (usually selected from clarithromycin, metronidazole, amoxicillin, and tetracycline), combined with acid suppressants and bismuth compounds." Jenks, Peter J., "Causes of failure of eradication of *Helicobacter pylori*" (2002) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1123549/) (last accessed on January 23, 2019).

### k.    MFD 11 – Appropriate Medical Care

"11. Mr. Jones disputes that his medical treatment was appropriate." Dkt. 136 at 12. Whether Mr. Jones' medical treatment was appropriate is a legal conclusion, not a fact. Moreover, Mr. Jones misconstrues the defendant's statement. The defendant's expert's opinion was limited to whether Mr. Jones' "triple drug regimen treatment after testing positive for H. pylori was appropriate." Dkt. 126 at 8. The defendant did not argue that Mr. Jones' medical treatment as a whole was appropriate.

### l.    MFD 12 – Adverse Inference

"12. Mr. Jones is entitled to, at the very least, argue for an inference that the Government's failure to properly maintain and treat its water system at FCI Terre Haute was caused by the Government's spoliation of pre-August 2015 documents." Dkt. 136 at 13. Mr. Jones' request for an adverse inference as sanctions for the defendant's alleged spoliation of evidence is problematic for at least two reasons. First, it is not a material fact in dispute. Second, such a request was never previously raised by Mr. Jones and is not appropriate buried on page 13 of his opposition to the defendant's motion for summary judgment. Rather, the appropriate time to request an adverse inference as sanctions would be in a separate motion for sanctions filed prior to the close of fact discovery. Moreover, whether the defendant properly maintained and treated its water system at FCI – TH is not at issue in this case. The case relates to whether the water at FCI – TH was contaminated with *H. pylori* and whether Mr. Jones contracted *H. pylori* from contaminated water at FCI – TH. Thus, an adverse inference would not be necessary.

### C.    Discussion

The only claim remaining in this action is the FTCA claim against the United States based on its alleged negligence in failing to properly maintain the water quality at FCI – TH, which

resulted in Mr. Jones contracting *H. pylori*.  The United States argues that it is entitled to summary judgment because Mr. Jones has no evidence of actual exposure to a toxic contaminant and no reliable evidence establishing either general or specific causation.

The law that applies in this case is the FTCA.  Whether a FTCA claim can be made against the United States depends on whether a private entity under like circumstances would be liable "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  Because the actions Mr. Jones complains of occurred in Indiana, Indiana law applies to this case.

The United States argues that to survive summary judgment, Mr. Jones must have evidence to support a toxic tort or water contamination claim.  The elements of such a claim are: (1) actual exposure to a toxic chemical; (2) actual personal injury; (3) general causation or "whether a particular agent can cause a particular illness," and (4) proximate causation or "whether the agent in fact caused the particular plaintiff's illness."  *Bryant v. United States*, No. 2:16-cv-00181-WTL-MJD, 2017 U.S. Dist. LEXIS 201507, at *12 (S.D. Ind. Dec. 7, 2017) (citing *Aurand v. Norfolk S. Ry. Co.*, 802 F. Supp. 2d 950, 953 (N.D. Ind. 2011)).  A toxic tort plaintiff must provide evidence of both general and specific causation.  *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 831 (7th Cir. 2015).  General causation examines whether the substance—in this case, water contaminated with *H. pylori*—"had the capacity to cause the harm alleged[.]"  *7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 389 (Ind. Ct. App. 2006).  Specific causation examines whether the substance did, in fact, cause the harm alleged.  *Id.*  The plaintiff must present expert testimony to establish causation when there is no obvious source of the injury.  *Myers v. Illinois Central Railroad Co.*, 629 F.3d 639, 643 (7th Cir. 2010); *7-Eleven*, 857 N.E.2d at 389 (noting in water contamination case that "[c]ausation in toxic tort cases is typically discussed in terms of generic and specific causation." (quoting *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002)).

Here, Mr. Jones must prove: (1) the water at FCI – TH was contaminated with *H. pylori*; (2) *H. pylori* can be contracted from contaminated water; (3) Mr. Jones did in fact contract *H. pylori* from the water at FCI – TH; and (4) his symptoms were from *H. pylori* and not from a preexisting condition. Based on one sample on July 24, 2014, that tested positive for total coliform, Mr. Jones speculates that the sample contained *H. pylori*, that the contamination was systemic, that he thereafter contracted *H. pylori* from this source, and that he thereafter experienced symptoms associated with *H. pylori*. However, he presents no evidence in support of any of those speculations. *See Granville v. Dart*, 2011 WL 892751 (N.D. Ill. March 11, 2011) ("Plaintiff's subjective belief that mold and mildew caused headaches and shortness of breath, without any evidence to substantiate that belief, is insufficient for the matter to proceed to a trial.) Indeed, Mr. Jones acknowledges that there is "little 'direct and positive evidence' available to him linking his infection to the contaminated water at FCI."[10]

Mr. Jones first asserts that he has provided sufficient evidence to meet his general causation burden – a person exposed to *H. pylori* through water consumption can contract an *H. pylori* infection as a result. However, his only evidence was an expert report, which the Court has stricken. Even if the Court considered the expert report, though, he fails to show he could have contracted *H. pylori* from drinking the water because Dr. Lopez acknowledges that "[t]he route H. pylori takes into the body has not been thoroughly examined in the literature." Indeed, Dr. Lopez did not provide evidence to support that H. pylori can be transmitted to humans through drinking water – his report *presumed it was true*. As the Court previously noted, it appears that the scientific community suspects that *H. pylori* can be transmitted through contaminated water, but it has not

---

[10] Mr. Jones blames his lack of evidence to the defendant's spoliation of evidence, but the Court has already explained such an adverse inference is improper where the defendant failed to properly previously present the issue to the Court. And it is still Mr. Jones' burden to present the necessary evidence.

been definitively shown that *H. pylori* can in fact be transmitted through contaminated water. *See* Aziz, Rami. K. et al., "Contaminated water as a source of Helicobacter pylori infection: A review" (2015) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4506966/) ("Over the preceding years and to date, the definitive mode of human infection by *Helicobacter pylori* has remained largely unknown and has thus gained the interest of researchers around the world. … Here, we sum up the current views of the water transmission hypothesis, and we discuss its implications.").

Mr. Jones also argues he has been able to show specific causation, but Mr. Jones' arguments are largely based on speculation and reliance on an hoped-for adverse inference that the defendant did not maintain its water supply in compliance with regulations.

However, Mr. Jones provides no evidence *H. pylori* was actually present in the FCI – TH water system. One sink tested positive for total coliform, not *H. pylori*. And there has been no testing submitted to show that there was ever *H. pylori* in the FCI – TH water system. Even as to the total coliform positive result, the defendant has provided an expert report explaining that the one positive sample for total coliform on a sink fixture was likely a one-off positive reading and unlikely indicative of a systemic problem because samples taken before July 24, four days later on July 28, and thereafter, all tested negative. Mr. Jones failed to present any evidence to refute Mr. Mundell's expert opinions.

Mr. Jones also provides no evidence that he was actually exposed to *H. pylori* while at FCI – TH – he merely believes he was based on what other inmates have told him. *See Murithi v. Hardy*, 2016 WL 890695 (N.D. Ill. March 9, 2016) (dismissing black mold claim where inmate saw mold in cell and read about it in books, but no doctor ever verified that mold was the cause of Plaintiff's sneezing, nor did Plaintiff have reports from an expert verifying that the substance was, in fact, black mold); *Mejia v. McCann*, 2010 WL 5149273 (N.D. Ill. Dec. 10, 2010) (rejecting Plaintiff's

testimony that someone told him that he should not wipe away the mold that grew on the walls because the mold could turn into something "toxic" if it were "irritated" because opinion was not based on medical, scientific, technical or other specialized knowledge within the scope of Fed.R.Evid. 702) (citing *United States v. York*, 572 F.3d 415, 420 (7th Cir.2009)); *Pratt v. Landings at Barksdale*, No. 09-1734, 2013 WL 5376021, at *4 (W.D. La. Sept. 24, 2013) ("It is essential that Plaintiffs demonstrate that they were, in fact, exposed to harmful levels of mold.").

Finally, even if he was exposed to *H. pylori* while at FCI – TH, Mr. Jones fails to provide evidence that that exposure caused him to contract *H. pylori*. *See Cunningham v. Masterwear Corp.*, 569 F.3d 673, 674–75 (7th Cir. 2009) ("mere exposure to toxins in excess of regulatory levels is insufficient to establish causation"). Nor has Mr. Jones shown that drinking the water at FCI – TH was the probable cause of his *H. pylori*. *Cf. Pennsylvania R. Co. v. Lincoln Trust Co*., 167 N.E. 721, 726 (Ind. Ct. App. 1929) ("The plaintiff satisfie[s] the burden which the law impose[s] upon him by proving such facts and circumstances from which it [is] made to reasonably appear that the drinking of the water [is] the probable efficient cause of the [disease].").

Mr. Jones has not presented any reliable expert testimony or any evidence beyond his own speculation to show that his condition is the result of exposure to *H. pylori* in FCI – TH's water supply. In short, Mr. Jones has not presented any evidence to support the elements of his water contamination claim.

The United States is therefore entitled to summary judgment on this claim.

### III.    Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual

litigants, and in meeting society's expectations that a system of justice operates effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," and in such cases, summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Mr. Jones' claim regarding black mold is **dismissed without prejudice.** Because Mr. Jones has not identified a genuine issue of material fact as to his *H. pylori* claim in this case, the defendant is entitled to judgment as a matter of law on that claim. Therefore, the defendant's motion for summary judgment, dkt. [125], is **granted.** Additionally, the defendant's motion to strike, dkt. [141], is **granted**.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 1/30/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JAMES JONES
736 W. 116th Place
CHICAGO, IL 60628

Electronically Registered Counsel